IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

_____

No. 13-0918

_____

FILED

May 9, 2014

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: F.S. AND Z.S.

_____

Appeal from the Circuit Court of Wood County
The Honorable J.D. Beane, Judge
Abuse and Neglect Case Nos. 12-JA-68 and 12-JA-69

REVERSED AND REMANDED

_____

Submitted: April 9, 2014
Filed: May 9, 2014

Reggie R. Bailey, Esq.                          Eric K. Powell, Esq.
Parkersburg, WV                                 Parkersburg, WV
Guardian ad Litem for the Petitioners           Counsel for the Respondent Father

Patrick Morrisey, Esq.
Attorney General
Lee A. Niezgoda, Esq.
Assistant Attorney General
White Hall, WV
Counsel for the Department of
Health and Human Resources

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1. "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

2. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

3. "'"""W. Va. Code, 49-6-2(c) [1980], requires the State Department of Welfare [now the Department of Human Services], in a child abuse or neglect case, to prove "conditions existing at the time of the filing of the petition . . . by clear and convincing proof." The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden.' Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981)." Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990).' Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994)." Syl. Pt. 3, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

Per Curiam:

This is an appeal filed on behalf of F.S. and Z.S.[1] by their guardian ad litem,

Reggie R. Bailey (hereinafter referred to collectively as "the petitioners"), from a decision

of the Circuit Court of Wood County dismissing a petition for abuse and neglect against their

father, C.S. (hereinafter "the respondent" or "the father"). The underlying abuse and neglect

petition was based upon allegations of sexual abuse by the father against F.S. The petitioners

contend that the circuit court erred by failing to find that clear and convincing evidence of

sexual abuse was presented. Based upon this Court's thorough review of the appendix

record, arguments of counsel, and applicable precedent, we reverse the ruling of the circuit

court and remand this case for further proceedings consistent with this opinion.

I. Factual and Procedural History

On May 23, 2012, the Department of Health and Human Resources (hereinafter

"DHHR") filed a petition for abuse and neglect, alleging that the respondent father had

---

[1]The petitioners are siblings. F.S. is an eleven-year-old girl, and Z.S. is a fifteen-year-old boy. They currently reside with their mother. In accordance with the customary practice of this Court, we refer to children by their initials in cases involving sensitive facts. *See, e.g., In re Michael Ray T.*, 206 W.Va. 434, 437 n.1, 525 S.E.2d 315, 318 n.1 (1999); *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 559 n.2, 490 S.E.2d 642, 646 n.2 (1997); *In re Tiffany Marie S.*, 196 W.Va. 223, 226 n.1, 470 S.E.2d 177, 180 n.1 (1996).

repeatedly sexually abused and assaulted F.S.[2]  The petition asserted that the children had visited their father every other weekend subsequent to a 2006 divorce between the petitioners' parents.  The father had remarried in 2009, and his current wife, L.S., has two daughters and one son.  The three step-children also resided in the home when the petitioners visited.  The petitioner, F.S., typically slept in a bedroom with L.S's daughters, sharing a top bunk with a step-sister.[3]  Another step-sister slept in the bottom bunk in the same bedroom.  The petitioner, Z.S. shared a bedroom with L.S.'s son.

The DHHR first learned of the alleged sexual abuse of F.S. in July 2011.  The petitioners' mother, M.S. (hereinafter "the mother"), reported that F.S. said  the respondent father had performed sexual acts on her.  She was eight years old at the time of that report.  Specifically, the mother indicated that F.S. stated that her father would get in bed with her

---

[2]On August 23, 2012, the DHHR filed an amended petition for abuse and neglect, adding the respondent's current wife, L.S., her ex-husband, W.S., and their children.  The amended petition alleged failure to protect the step-children from the respondent.

[3]The step-sisters do not report any knowledge of the respondent entering the bedroom.

and "rub his wiener on her and pee on her."[4]  In response to these allegations of abuse, Child

Protective Services worker, Ms. Connie Carpenter, interviewed F.S. in August 2011.  The

child informed Ms. Carpenter that her father got in bed with her on several occasions and

"wet" on her with his penis.[5]

Detective Shanna Modesitt of the Wood County Sheriff's Office also

interviewed[6] F.S. in August 2011.  F.S. told the detective that her father "wets" on her when

he gets in bed with her.  During adjudicatory hearings held in late 2012 and 2013, the circuit

court reviewed a video recording of the child's interview with Detective Modesitt.

According to the transcript of that video interview provided in the record to this Court, F.S.

specifically informed Detective Modesitt that her father has gotten in bed with her several

times when other family members were not home.  She indicated that he placed his penis on

---

[4]A detailed recital of the graphic sexual allegations of this case is necessary because of the nature of the circuit court's order this Court is called upon to review.  Our task is to determine whether, upon the facts available to it at the adjudicatory hearing, the circuit court erred in dismissing the petition for abuse and neglect filed against the father.

[5]Ms. Carpenter testified that F.S. described the "squishy" sounds made before her father would wet on her.

[6]Detective Modesitt had been certified to interview children concerning sexual abuse.

3

her legs and vaginal area, that it made "squishy noises," and that it felt "sticky."[7] The child also indicated that she sometimes slept on the bottom bunk if her step-sister was not at home.

She stated that her father pulled her pants down to her ankles and lifted her shirt to touch her chest. She believed that the last of these incidents occurred when she was in third grade, and she no longer had contact with her father by the time of the interview with Detective Modesitt.

During the adjudicatory hearings, the respondent testified and denied any sexual abuse of his daughter. He explained that the version of the alleged occurrences presented by F.S. lacked credibility because he could not have accessed her on the top bunk without awakening his step-daughters who also slept in the room. He also testified that he sleeps downstairs and other children were always present when F.S. was visiting. Although

---

[7]F.S. stated that her father "unzips and sometimes he wets on me." She said, "I pretend to go to the bathroom and I wipe it off." She also informed Detective Modesitt that it "smells disgusting." She stated that "he'll sometimes just unzip . . . and he'll sometimes pull down his underwear or he sometimes has a hole in his underwear." She indicated that "he just comes against me and stuff. He'll just grab it out and kind of pull it and kind of just rub it around me and rub it like right here . . ." on her vagina and buttocks. She explained that she had tried to scoot away from him in bed, but "[e]very time I try to scoot over he'll keep on scooting until I can't move anymore." She also stated that he sometimes placed his penis slightly into her vagina.

4

he acknowledged his failure[8] of a polygraph test, he alleged that the failure resulted from some "changed" questions by the administrator of the test.[9]

A clinical psychologist, Mary Longmore Gable, testified that she had conducted approximately thirty-five sessions of therapy with F.S. Ms. Gable explained that F.S. reported several issues regarding her father's sexual conduct toward her,[10] informing Ms. Gable that her father lingered near her private areas while bathing and drying her. F.S. also informed Ms. Gable that her father pulled down his "boy private parts" and would begin "rubbing them on top of her." F.S. reported specific details about how her legs were spread, how her father would unzip his pants, and how his penis felt "squishy like a blob of jelly." Ms. Gable also explained that F.S. told her that she sometimes pretended to be sleeping, in

---

[8]Detective Modesitt testified that the father failed the portions of the lie detector test dealing with his sexual touching of F.S.

[9]During questioning regarding the father's failure of the polygraph test, the mother's attorney asked the respondent: "Well, did he rephrase questions, or - - I don't understand what you mean. Could you give an example." The respondent explained that "[i]t's been quite some time. I'd have to recall that information. If you would give me a few minutes, Mr. White. I just remember that the - - the question was different." The mother's attorney then inquired regarding whether the test administrator asked "you a question twice, one phrased differently than another?" The respondent replied, "I'm not sure. I just know it was different."

[10]Prior to starting therapy with Ms. Gable, F.S. had refused to speak of the abuse when interviewed by Magistrate Joyce Purkey and her assistant in conjunction with the mother's attempt to obtain a protective order against the respondent. At that time, F.S. denied any inappropriate acts by her father. The child also failed to make any disclosure of abuse to her brother's family therapist, Jennifer Cozart. She later explained to Detective Modesitt that she had refused to talk about the abuse when there was more than one other person present.

an effort to reduce the likelihood that her father would touch her. Ms. Gable testified that she believed F.S. had been sexually abused based on the consistency of the child's statements, the sensory details of the sexual events, her child-appropriate language, and the emotions she expressed concerning the alleged occurrences. Ms. Gable additionally noted that she had not detected any "red flags" indicating the F.S. had been coached or was fabricating the claims of sexual abuse.[11]

Dr. Fred J. Krieg, a forensic psychologist, was called by the respondent. Although Dr. Krieg had not personally interviewed F.S., he had reviewed all the records of her allegations and testified that he was unable to "say whether or not [the child] was sexually abused or not." In his review of F.S.'s revelations to Detective Modesitt, he found some indication that the child was attempting to determine whether her answers were pleasing to the interviewer and that she seemed susceptible to suggestibility.[12] Dr. Krieg also noted that there was no physical evidence of abuse and that the child had refused to discuss

---

[11]Ms. Gable acknowledged F.S.'s reluctance to talk about the sexual abuse, testifying that the child did not initially "want to talk about it with me because she was afraid I wouldn't be her friend anymore." Ms. Gable explained that such reactions were common with children. Consistent with this emotional reaction, the child also informed Detective Modesitt that she "would only talk . . . if there's not two people."

[12]Dr. Krieg referenced F.S.'s statement at the conclusion of the interview with Detective Modesitt. F.S. was asked whether there was anything else she wanted to talk about with the detective, and she responded by saying, "It's hard to think of something unless because if you say it first and I'll remember what to say." Dr Krieg opined that this could be a "sign that somebody outside has said, 'These are the things you need to say.'"

the abuse when questioned in her father's criminal trial and with one of the therapists, Ms. Cozart.

On August 2, 2013, the circuit court dismissed the petition for abuse and neglect, finding that the facts presented did not constitute clear and convincing evidence of abuse by the respondent. In so ruling, the circuit court found inconsistencies in F.S.'s allegations, such as the fact that she indicated she was always asleep throughout these occurrences and said that she did not actually see her father performing the acts.[13] Moreover, the circuit court emphasized the fact that F.S. had refused to speak of the abuse and denied anything inappropriate when interviewed by Magistrate Joyce Purkey and made no disclosure of abuse to her brother's therapist, Ms. Cozart. F.S. further refused to discuss the abuse at the respondent's criminal trial in April 2013, and he was consequently acquitted.[14]

The circuit court also noted inconsistencies in the mother's statements with respect to how and when she learned of the alleged abuse. The mother had informed Ms.

[13]Although F.S. stated, during parts of the interview with Detective Modesitt, that she did not see her father performing these sexual acts, she did describe seeing him standing in her room and lying down beside her when these sexual incidents occurred. F.S. also indicated that she sometimes pretended to be asleep in an attempt to prevent the inappropriate touching.

[14]As this Court recognized in *In re Taylor B.*, 201 W.Va. 60, 491 S.E.2d 607 (1997), acquittal of criminal charges has no bearing on abuse and neglect cases. "[C]ivil abuse and neglect proceedings focus directly upon the safety and well-being of the child and are not simply 'companion cases' to criminal prosecutions." *Id.* at 66, 491 S.E.2d at 613.

7

Carpenter and Ms. Cozart that her son, Z.S., told her of the abuse toward F.S. However, she told Detective Modesitt that F.S. made the original revelations of abuse. The circuit court also noted that the mother maintained a significant grudge against the father[15] and had exaggerated the effects of the alleged abuse when discussing difficulties in F.S.'s school performance. The principal of the school F.S. attended indicated that F.S. was progressing well in school and had not experienced any behavioral problems.

In addressing the testimony of the psychologist, Ms. Gable, the circuit court observed that she was not a forensic psychologist and had accepted F.S.'s statements as true, without any independent investigation of her credibility or other indicia of reliability of her claims. This Court's review of the record reveals that Ms. Gable was initially unaware of F.S.'s refusal to speak about the abuse to certain other individuals. The respondent's counsel questioned Ms. Gable during the adjudicatory hearing and informed her that the child had sometimes refused to speak of the abuse. Upon learning this, Ms. Gable clearly indicated that such knowledge would not necessarily alter her conclusion that F.S. had been abused. Ms. Gable explained that "it would depend on the change in consistency" and that she would still look "at the emotional response, the language, and all of those things in combination."

---

[15]The mother had made an allegation of sexual misconduct by the father in 2006. At that time, the mother had apparently indicated that the father had spent too much time bathing the child's private areas. That claim was found to be unsubstantiated and was not extensively developed in the record currently before this Court. The allegations which form the basis for the present issue occurred subsequent to that initial allegation.

8

Ms. Gable stated that F.S. "has too much that is consistent with children that are sexually abused."

The petitioners appeal the circuit court's adjudicatory order, contending that the circuit court erred in dismissing the petition for abuse and neglect. The petitioners argue that the facts presented constitute clear and convincing evidence of sexual abuse.

## II. Standard of Review

This case is before this Court on appeal from the circuit court's order dismissing the abuse and neglect petition and finding that the facts presented did not constitute clear and convincing evidence of sexual abuse. Generally, this Court accords plenary review to a circuit court's resolution of questions of law, while factual determinations made by the circuit court are reversible only if clearly erroneous. In *In re Emily*, 208 W.Va. 325, 540 S.E.2d 542 (2000), this Court explained: "For appeals resulting from abuse and neglect proceedings, such as the case sub judice, we employ a compound standard of review: conclusions of law are subject to a *de novo* review, while findings of fact are weighed against a clearly erroneous standard." *Id*. at 332, 540 S.E.2d at 549. The concept of mixed questions of law and fact was addressed in *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995), and this Court explained that "[a]lthough factual findings are reviewed under the clearly erroneous standard, mixed questions of law and fact that

9

require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles are reviewed *de novo*." *Id.* at 265, 460 S.E.2d at 266.

These standards were also expressed in syllabus point one of *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996):

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

*See also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011) ("Under this standard of proof, the appellate court must distinguish between the specific facts found by the trial court and the combined weight of those facts." (internal quotes and citations omitted)). This Court has also recognized that credibility determinations are uniquely within the province of a circuit court. This Court explained this concept in *Tiffany Marie S.*, as follows:

> [w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) [of the West Virginia Rules of Civil Procedure] demands even greater deference to the trial court's findings[.] . . . Deference is appropriate because the

10

> trial judge was on the spot and is better able than an appellate
> court to decide whether the error affected substantial rights of
> the parties.

196 W.Va. at 231, 470 S.E.2d at 185 (internal quotations and citations omitted). Guided by

those standards of review, we address the petitioners' assignment of error.


## III. Discussion

This Court has consistently recognized that a parent's right to the care and

custody of his child is a firmly established liberty interest protected by the due process

clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000);

*In re Jeffrey R.L.*, 190 W.Va. 24, 32, 435 S.E.2d 162, 170 (1993). This Court in *Jeffrey R.L.*

acknowledged the manner in which child abuse and neglect cases are addressed, specifically

in conjunction with observance of the fundamental rights of a parent to the care and custody

of his child.

> In the Court's analysis of child abuse and neglect cases,
> we must take into consideration the rights and interests of all of
> the parties in reaching an ultimate resolution of the issues before
> us. Although the rights of the natural parents to the custody of
> their child and the interests of the State as *parens patriae* merit
> significant consideration by this Court, the best interests of the
> child are paramount. Thus, as an initial matter, we emphasize
> that the health, safety, and welfare of [the child] must be our
> primary concern in analyzing the facts and issues before us.

*Jeffrey R.L.,* 190 W.Va. at 32, 435 S.E.2d at 170.

11

As this Court stated in syllabus point three of *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996), "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Thus, while a parent's right is fundamental, it is certainly not absolute. A parent's right may be limited or ultimately terminated where it is relinquished, abandoned, or where the parent has engaged in conduct requiring restriction of parental rights.

A petition for abuse and neglect[16] may be filed in this state under the provisions of West Virginia Code § 49-6-2 (2009). That statute enunciates the manner of evaluation of such a case and directs the circuit court to make certain findings subsequent to an adjudicatory hearing, as follows:

> At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

W.Va. Code § 49-6-2(c). In syllabus point three of *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995), this Court addressed this statute and observed:

> """W. Va. Code, 49-6-2(c) [1980], requires the State Department of Welfare [now the Department of Human

---

[16]An "[a]bused child" is defined in West Virginia Code § 49-1-3(a) (2009) as a "child whose health or welfare is harmed or threatened by . . . [s]exual abuse or sexual exploitation[.]"

Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).' Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990)." Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994).

In this Court's appellate review of the dismissal of petitions for abuse and neglect, we have evaluated the dispositive issue of whether clear and convincing evidence of abuse was established. For example, in *In re Tyler D.*, 213 W.Va. 149, 578 S.E.2d 343 (2003), the DHHR and the children's guardian ad litem appealed an order of the circuit court dismissing the petition for abuse and neglect. Upon review of the facts presented, this Court reversed the circuit court and found "clear and convincing evidence that Tyler D. was sexually abused." *Id.* at 156, 578 S.E.2d at 350. We reasoned as follows:

> While there was no physical evidence, three witnesses testified that Tyler D's reports of sexual abuse were credible. In particular, Mr. Mayfield, Tyler's psychotherapist, testified that he believed that Tyler was telling the truth about being sexually abused based upon the language he used, the consistency in his statements, and the details he provided. Likewise, Beverly Green, a child protective services investigator with the Allegheny County Department of Social Services in Maryland, testified that the consistency in Tyler's statements about the sexual abuse indicated that he was being truthful. Finally, Glenda Razo, a case manager for child abuse and neglect in Fort

13

Knox, Kentucky, testified that Tyler's allegations of sexual abuse were credible. All three witnesses indicated that they have considerable experience in dealing with sexually abused children. This evidence cannot simply be ignored.

*Id.* at 156-57, 578 S.E.2d at 350-51. "Thus, given all of the above, we find that the circuit court erred by concluding that there was no clear and convincing evidence that these children were abused and neglected." *Id.* at 157, 578 S.E.2d at 351.

Similarly, this Court reversed a circuit court's dismissal of an abuse and neglect petition in *In re Katelyn T.*, 225 W.Va. 264, 692 S.E.2d 307 (2010). In that case, the guardian ad litem and DHHR appealed the circuit court's dismissal of an abuse and neglect petition alleging sexual abuse, and this Court found that the evidence presented below constituted clear and convincing evidence of the abuse. *Id.* at 278, 692 S.E.2d at 321.

In the present case, although there was no physical evidence of abuse, F.S.'s testimony, presented to the circuit court through the video recording of her interview with Detective Modesitt, provided explicit evidence of multiple episodes of sexual abuse. The child's statements to Ms. Carpenter and Ms. Gable also detailed the sexual abuse she suffered. Significantly, the circuit court did not find that F.S. fabricated the claims of sexual abuse. It appears that the circuit court dismissed the petition based upon particular elements of doubt or components of uncertainty revealed within F.S.'s testimony. For instance, the child referenced "sleeping" during the sexual abuse and stated, in at least one portion of her

14

questioning, that she did not "see" her father performing these acts. While these issues were quite reasonably included in the court's evaluation of the evidence and the child's credibility, those instances cannot be viewed in isolation from the extensive other evidence of sexual abuse. The child's testimony also revealed instances where she observed her father during the occurrences and was awake and aware of his actions.[17]

---

[17]Likewise, the child's self-imposed rule of refusal to speak of the abuse where more than one person was present must be evaluated in terms of her age and maturity. The psychologist, Ms. Gable, testified that such emotional responses are common in children. While perhaps unconventional, these issues do not entirely undermine the child's credibility. In *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990), this Court explained that cases involving child victims

> generally pit the child's credibility against an adult's credibility and often times an adult family member's credibility. Since sexual abuse committed against children is such an aberrant behavior, most people find it easier to dismiss the child's testimony as being coached or made up or conclude that any touching of a child's private parts by an adult must have been by accident. In addition, children often have greater difficulty than adults in establishing precise dates of incidents of sexual abuse, not only because small children don't possess the same grasp of time as adults, but because they obviously may not report acts of sexual abuse promptly, either because they are abused by a primary care-taker and authority figure and are therefore unaware such conduct is wrong, or because of threats of physical harm by one in almost total control of their life. In most cases of sexual abuse against children by a care-taker or relative, the acts of sexual abuse transpire over a substantial period of time, often several years.

*Id.* at 650-51, 398 S.E.2d 132-33 (footnote omitted).

15

Another element of uncertainty was created by the testimony of Dr. Krieg, indicating that he had discerned signs of suggestibility in the child during his review of the evidence. It is significant to note that Dr. Krieg never spoke directly with F.S.; nor did he testify that she had fabricated the sexual abuse allegations. He concluded, "My testimony is that in reviewing the documentation that led to this charge, that I don't find reliable evidence in the information to be able to tell us whether or not that child was sexually abused." Those individuals to whom F.S. spoke directly, however, painted a vastly different picture. Ms. Gable, Ms. Carpenter, and Detective Modesitt testified concerning the child's assertions and the distinct graphic sensory details she provided, as set forth above. Ms. Gable testified that F.S.'s language and emotional states were consistent with a child who has been sexually abused. Further, Ms. Gable found no signs that F.S. was lying or had been coached. Ms. Gable stated, "A few details may change, but overall the story does not."

This is a classic case of the inability of a trial court to ascertain, with complete certainty, the truth of the allegations of abuse. As indicated by the circuit court's adjudicatory order, one could quite effortlessly compile an inventory of doubts and skepticism based upon the evidence presented. The evidence is simply not crystal clear, beyond all doubt. However, that is not the standard to be employed in an abuse and neglect case. In reviewing the entirety of the evidence, this Court must adhere to the appellate standard of review set forth above, according significant weight to the circuit court's

credibility determinations while refusing to abdicate our responsibility to evaluate the evidence and determine whether an error has been committed.

It is imperative to note that the evidence in an abuse and neglect case does not have to satisfy the stringent standard of beyond a reasonable doubt; the evidence must establish abuse by clear and convincing evidence. This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Brown v. Gobble*, 196 W.Va. 559, 564, 474 S.E.2d 489, 494 (1996) (internal citations omitted). We have also stated that the clear and convincing standard is "intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *Cramer v. W. Va. Dept. of Highways*, 180 W.Va. 97, 99 n.1, 375 S.E.2d 568, 570 n.1 (1988); *see also Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (holding that party with burden of persuasion may prevail only if he can "place in the ultimate factfinder an abiding conviction that the truth of [his] factual contentions are 'highly probable.'").

Reviewing the facts presented in the adjudicatory hearing to determine whether they constituted clear and convincing evidence of abuse and employing the standards set forth in *Tiffany Marie S.*, this Court is "left with the definite and firm conviction that a

17

mistake has been committed." Syl. Pt. 1, in part, *Tiffany Marie S.*, 196 W.Va. at 224, 470 S.E.2d at 178. We find that the evidence presented below constitutes clear and convincing evidence of sexual abuse by the respondent. Utilizing child-appropriate language and reiterating the sexually explicit details during multiple interviews, F.S. explained episodes during which her father got in bed with her, rubbed himself against her legs and vaginal area, and wet on her. She described the multitude of sensory aspects of those experiences, in vivid detail. These claims were investigated by the DHHR and the Wood County Sheriff's Office and discussed through the therapy of Ms. Gable. Based upon all the evidence presented on these allegations, we conclude that the circuit court erred in dismissing the petition and finding lack of clear and convincing evidence that the respondent abused his daughter.[18]

---

[18]Having determined that the facts support a finding that clear and convincing evidence of abuse was presented, the petitioners should be adjudicated as abused children. In the abuse and neglect setting, this Court has recognized the rights of children residing in the home, such the respondent's son, Z.S., even where he was not alleged to have been a victim. In syllabus point two of *Christina L.*, this Court explained:

> Where there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodian, another child residing in the home when the abuse took place who is not a direct victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under W.Va. Code, 49-1-3(a) (1994).

194 W.Va. at 447, 460 S.E.2d at 693.

IV.  Conclusion

For the foregoing reasons, the order of the Circuit Court of Wood County

dismissing the petition for abuse and neglect is reversed.[19]  Accordingly, this case is

_____

[19]Having completed the threshold adjudicatory phase with the finding of abuse, this case will proceed toward disposition in accordance with West Virginia Code § 49-6-5 (2009).  The dispositional phase provides the circuit court with broad latitude to frame an appropriate resolution of the issues.  As this Court has recognized, the abuse and neglect statutes do not authorize a court to intervene in the parent/child relationship until an adjudication of abuse has been made.  "In a child abuse and neglect hearing, before a court can begin to make any of the dispositional alternatives under W. Va. Code, 49-6-5, it must hold a hearing under W. Va. Code, 49-6-2, and determine 'whether such child is abused or neglected.'  Such a finding is a prerequisite to further continuation of the case."  Syl. Pt. 1, *State v. T.C.*, 172 W.Va. 47, 303 S.E.2d 685 (1983).  If a court does not make that initial finding of abuse, no further action is permitted in the abuse and neglect realm.  As Justice Workman suggested in a concurrence to *In re Kasey M.*, 228 W.Va. 221, 719 S.E.2d 389 (2010), an alternative at that juncture would be a request for modification of the custodial responsibility.

> Pursuant to W. Va. Code § 48-9-401 (2001) (Repl. Vol. 2009), a decision on a motion for modification of custody requires a determination of whether there has been a substantial change in the circumstances of the child or of one or both parents and whether a modification is necessary to serve the best interests of the child, obviously a completely different standard than a finding of abuse and neglect.  The allegations of abuse and neglect certainly constituted a change in circumstances, and there were several other factors that indicated that it would be in C.C.'s best interests to be placed in the custody of his mother. Therefore, regardless of the outcome of the abuse and neglect case, it seems that the circumstances probably warranted a modification of custody pursuant to W. Va. Code § 48-9-401.

228 W.Va. at 226, 719 S.E.2d at 394 (Workman, J., concurring).

19

remanded to the circuit court for entry of an order adjudicating F.S. and Z.S. as abused

children based upon the sexual abuse perpetrated upon F.S. by the respondent and for further

proceedings consistent with this opinion.[20]    The mandate of this Court shall issue

contemporaneously herewith.

Reversed and Remanded.

---

[20]This matter should be expedited.  "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention.  Unjustified procedural delays wreak havoc on a child's development, stability and security."  Syl. Pt. 1, in part, *In re Carlita B*., 185 W.Va. 613, 408 S.E.2d 365 (1991).  As the case proceeds in the dispositional phase, this Court does not in any manner limit the discretion of the circuit court as provided by statute; nor do we suggest any particular result.  However, in the event the circuit court elects to consider an order of visitation, the court must remain mindful of the principles expressed in syllabus point three of *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996), as follows:

> Because of the extraordinary nature of supervised visitation, such visitation should be ordered when necessary to protect the best interests of the children.  In determining the best interests of the children when there are allegations of sexual or child abuse, the circuit court should weigh the risk of harm of supervised visitation or the deprivation of any visitation to the parent who allegedly committed the abuse if the allegations are false against the risk of harm of unsupervised visitation to the child if the allegations are true.

*Id.* at 241, 470 S.E.2d at 195.